**Ernest TUSINO, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, and Ronald Carey, individually and in his capacity as General President of the International Brotherhood of Teamsters, Defendants.**

No. 96 Civ. 2774 (DNE).

United States District Court,
S.D. New York.

June 6, 1996.

Memorandum Modifying Decision
June 21, 1996.

Gary L. Meyers, Brookline, Massachusetts, and Tanner Propp, LLP, New York City (Gregory D. Frost, of counsel), for plaintiff Ernest Tusino.

Gabriel O. Dumont, Jr., Boston, Massachusetts, and International Brotherhood of Teamsters Legal Department, Washington, D.C. (Mary T. Connelly, of counsel), for defendants.

## OPINION & ORDER

EDELSTEIN, District Judge:

Pursuant to Federal Rule of Civil Procedure ("Rule") 65, plaintiff, Ernest Tusino, ("Tusino" or "plaintiff") brings the instant motion, seeking a preliminary injunction, enjoining defendants from imposing disciplinary sanctions that defendant Ronald Carey ("Carey") imposed on plaintiff, pursuant to Carey's authority as General President of the International Brotherhood of Teamsters ("the IBT"). Tusino further asks this Court to issue a preliminary injunction, ordering that "Plaintiff be immediately reinstated as a member of the New England Teamsters Pension Trustee Board" and "[s]uspending the [IBT] Local 170 national delegate election until such time as the Office of the Election Officer investigates and makes a determination on Election Office Case No. P–639." (Plaintiff's Motion for Preliminary Injunction Pursuant to F.R.C.P. 65 ("Plaintiff's Notice of Motion") at 1–2.)

## BACKGROUND

Tusino has been a member of IBT Local 170 ("Local 170") in Worcester, Massachusetts since 1950. (*Tusino v. International Bhd. of Teamsters, et al.*, 96 Civ. 2774, Verified Complaint ("Verified Complaint") ¶ 5.) "Since 1988, Plaintiff has continuously held the position of Secretary–Treasurer of Local 170. Plaintiff is also a trustee of the New England Teamsters Pension Trustee Board." *Id.*

The instant dispute has its genesis in an administrative proceeding that a disgruntled member of Local 170 named Richard Welk ("Welk") brought against Local 170. Welk

alleged that Local 170 was operated in an arbitrary and discriminatory manner and that Local 170 discriminated against him by failing and refusing to refer him for a job with an employer named Worthy Brothers. (*See* Decision, 1–CB–8132, National Labor Relations Board Division of Judges ("NLRB Decision"), Martin J. Linsky Administrative Law Judge at 1 (July 26, 1994) (attached to Verified Complaint as Exhibit # 1).) Welk contended that Tusino, in his capacity as Secretary–Treasurer of Local 170, operated "a hiring hall in an arbitrary and discriminatory manner and [discriminated] against ... Welk by failing and refusing to refer ... Welk out to work because [Welk] brought up fellow union member Milton Pierce on internal union charges and because [Welk] filed a charge with the [NLRB]." *Id.* On September 9, 1993, the NLRB issued a complaint, alleging that Local 170 violated sections 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act ("the NLRA"). *Id.*

On February 28, 1994, Administrative Law Judge Martin J. Linsky ("Judge Linsky") conducted a hearing on the charges brought against Local 170. *Id.* At the hearing, Judge Linsky heard testimony from Tusino, Welk, and George Valeri ("Valeri") who was one of Local 170's "business agents responsible for the construction industry." *Id.* at 4.

In a decision dated July 26, 1994, Judge Linsky found that "there can be no doubt that, in practice, [Local 170] operated an exclusive hiring hall with respect to the construction industry." *Id.* at 5. Because Local 170 operated an exclusive hiring hall, Judge Linsky found that the NLRA mandated that Local 170 operate "with due regard to the fair and equal treatment in granting referrals" and ordered that Local 170 could not refuse "to refer an individual to work ... for discriminatory reasons." *Id.* (citations omitted).

Judge Linsky further found that: (1) Local 170 violated sections 8(b)(1)(A) and (2) of the NLRA "by maintaining an exclusive hiring hall for construction whereby employment referrals were made without reference to objective standards or criteria, and in an otherwise discriminatory manner"; and (2) Local 170 violated sections 8(b)(1)(A) and (2) of the NLRA "by failing and refusing to refer Richard Welk for employment for arbitrary and discriminatory reasons." *Id.* at 7.

In reaching the conclusion that Local 170 had violated provisions of the NLRA, Judge Linsky discussed both the testimony at the hearing and Tusino's affidavit of June 17, 1993. (*See* Affidavit of Ernest Tusino ("Tusino Affidavit")) (June 17, 1993) (attached at Exhibit # 11 to Affidavit of Mary E. Connelly (April 2, 1996).) Judge Linsky's decision states that the parties did not dispute that Local 170 lacked "written rules or guidelines governing the referral of individuals." NLRB Decision at 5. He further found that "the record evidence" indicated that "Tusino and Valeri did not use any objective criteria in referring individuals to particular jobs in April and June 1993 or, for that matter, at any time." *Id.* Judge Linsky found that Tusino's and Valeri's testimony made it "quite evident ... that they referred relatives and supporters to these jobs." *Id.* Judge Linsky stated that, in making referrals, Tusino relied on his subjective knowledge of an individual's experience, financial situation, and the length of time that individual had been unemployed. *See id.* at 5–6. Judge Linsky found that "[t]he reliance on such personal knowledge is purely subjective because the business agent making the reference is more likely to be familiar with the situation of his friends and supporters[,] and it is difficult indeed to know the personal situations of thousands of union members." *Id.* at 6 (citation omitted). Moreover, although Judge Linsky found that Local 170 "maintained referral lists," he not only concluded that four separate lists were in use, but also found that "Valeri and Tusino testified that there was no rhyme or reasons to the lists, and [they] referred individuals who were not even on the lists." *Id.* at 6. He concluded that "the Union gave no priority to those individuals who were on the referral lists." *Id.*

After reviewing the evidence, Judge Linsky found: (1) "it is clear that in making referrals [Local 170] did so without objective considerations and in violation of [the NLRA]"; (2) "[i]t was wrong and a denial of fair representation to give preference in re-

ferrals as was done in this case to relatives, friends, or supporters of the agent making the referral"; and (3) "[i]t is clear that the Union operated its referral system in an arbitrary manner and devoid of any objective criteria." *Id.* Judge Linsky found that the arbitrary nature of the referral system was demonstrated by the fact that "referrals made by [Local 170] were made without any written and objective standards, the referral lists gave no priority among individuals, and in fact each of [Local 170's] agents maintained his own separate list, that various criteria for referrals used by [Local 170] were subjective because they were solely within the personal knowledge of [Local 170's] agents, and that the other criteria, namely relatives and supporters of [Local 170's] agents are unlawful." *Id.*

After Judge Linsky rendered his decision, the Administrator of the IBT's Ethical Practices Committee ("EPC") brought a specification that alleged that Tusino and Valeri "brought reproach upon the IBT in violation of Article II, § 2(a) and Article XIX, §§ 7(b)(1), (2) and (5) of the International Constitution by engaging in nepotism in work referrals, unlawful, arbitrary and discriminatory manipulation of hiring hall procedures in order to obtain work for their relatives, friends and political supporters and by discriminating against Local 170 member Richard Welk because he filed unfair labor practice charges with the [NLRB] against the Local." (Findings and Recommendations of EPC Hearing Panel, *In re: Earnest Tusino and George Valeri* ("EPC Decision") at 1 (Jan. 4, 1996) (attached as Exhibit # 2 to Verified Complaint).) Tusino and Valeri "were also charged with violating Article 7, § 11 and Article 14, § 4 of the Local 170 Bylaws which provides that Local Union Officers and Business Agents are obligated to comply with and abide by the International Constitution and Local Union Bylaws." *Id.* at 1–2.

The EPC conducted a hearing on these charges on March 27, 1995, and May 16, 1995. *Id.* at 2. Although Valeri and Tusino testified at the hearing, Richard Welk did not. *See id.* at 5–6. At the hearing, "[t]he charging party . . . relied exclusively on the

record from the NLRB proceeding in presenting his case to [the EPC]." *Id.* at 4. In contrast, Tusino and Valeri testified that "Local 170 did not operate a discriminatory hiring hall" and they "attack[ed] Welk's credibility[,] claiming that he is a gun-toting, antisemitic racist and concerned only with himself and not his other Union brothers." *Id.* at 5. Moreover, Tusino asserted that his June 17, 1993, affidavit—which Judge Linsky found to be evidence that Local 170 was operated improperly—"was not accurate and that it was taken out of context." *Id.*

On January 4, 1996, the EPC issued a decision that found the charging party had failed to produce sufficient evidence to substantiate the charges against Tusino. The EPC Decision states that the EPC was "troubled with the charging party's extreme reliance on the NLRB proceedings." *Id.* at 6. This decision states that "[w]hile the NLRB proceedings may indeed be relevant and are certainly evidence in this case, the [EPC] is of the opinion that this case should have been tried as if it was [sic] being tried for the first time." *Id.*

Moreover, the EPC Decision found that Tusino and Valeri had presented evidence that was sufficient to rebut the charge that Local 170 had discriminated against Welk by refusing to refer him for work. The EPC found that "other than [the] purported instance with Mr. Welk, there were no other instances shown by the charging party that discriminatory referrals were made." *Id.* at 10–11. Moreover, the EPC found that "Tusino has adequately explained the events surrounding the job referrals to Worthy Brothers," and the EPC did not find that Tusino discriminated against Welk. *Id.* Tusino testified that he did not refer Welk for a job with Worthy Brothers because Welk was the eighth man on a list of Local 170 members looking for work and the employer only needed seven workers. *Id.* at 7. Tusino and Valeri also "presented some evidence that employees who were referred to Worthy Brothers had been out of work longer than Welk." *Id.* Accordingly, the EPC found that "it appears from a preponderance of the reliable evidence that there was [sic] not enough positions available and other Local

170 members who were out of work longer." *Id.* at 11.

The EPC also found that the practice of referring work at Local 170 without written guidelines did not constitute a violation of the IBT Constitution or Local 170's Bylaws. The EPC stated that "[w]hile it appears that Local 170 suffered from a historical lack of written guidelines, these problems have since been cured." *Id.* The EPC noted that "Tusino's and Valeri's defense that the lack of written guidelines has gone on for years in Local 170 as well as other locals is no defense." *Id.* The EPC found, however, that Tusino and Valeri "were simply fortunate in this case that the charging party failed to show where the lack of written guidelines was the basis for any discriminatory conduct." *Id.*

In addition, the EPC found that there was insufficient evidence in the record to substantiate the allegation that Tusino had engaged in nepotism. The EPC noted that Tusino testified that he "refused to refer his own son-in-law . . . to a position because [the son-in-law] had quit a full-time, well-paying Local 170 job with a beverage distributor." *Id.* at 10 (citation omitted). "Tusino testified that the reason he did not refer his son-in-law to any positions was that he had other [Local 170] members who had been out of work longer and he could not justify referring his son-in-law to a job after his son-in-law had left a full-time well-paying position." *Id.* (citation omitted). The EPC found that "[i]f anything, this [conduct] shows that Tusino did not engage in nepotism." *Id.*

After the EPC issued its "Findings and Recommendations," the charges against Tusino were referred to IBT General President Carey, who issued a "Decision of the General President" on March 14, 1996. (Decision of the General President, *In re: Ethical Practices Committee Charges Against Ernest Tusino and George Valeri* ("General President's Decision") (March 14, 1996) (attached as Exhibit # 3 to Verified Complaint).) Contrary to the EPC Decision, Carey found that "the charges against [Tusino and Valeri] have been proven [sic] by a preponderance of the reliable evidence." *Id.* at 2. Carey noted that Judge Linsky's decision stated that " 'it

could not be clearer' that Bother Tusino, as an agent of Local 170, unlawfully refused to refer member Richard Welk for work because [Welk] had filed an unfair labor practice charge against the Local Union with the NLRB," and Carey found that Judge Linsky had based this conclusion on Tusino's June 17, 1993, affidavit. *Id.* Carey found that in this affidavit, Tusino "admitted that in 1993 he had refused to refer Brother Welk for work to an employer, Worthy Brothers, because Brother Welk had filed an unfair labor practice charge against the Local Union." *Id.*

Unlike the EPC, Carey did not find credible Tusino's claim that "he had not read the affidavit . . . before signing it and was misquoted" in the affidavit. *Id.* at 3. Although the EPC "found credible Brother Tusino's claim that he had been pressured or misinterpreted by the NLRB investigator" who drafted the affidavit for Tusino's signature, Carey "disagree[d] with the panel's finding on this point." *Id.* Carey noted that "Tusino admitted at the NLRB hearing that he had previously given affidavits to Board agents and, therefore was familiar with the procedures for affidavit taking." *Id.* at 4. In addition to Tusino's experience with affidavits, Carey found that "the length of the affidavit, twenty-two (22) pages, suggests that Brother Tusino spent some time with the Board agent giving, reviewing and signing his statement." *Id.* Carey also found that it was unlikely that Tusino did not carefully review the affidavit in light of the fact that "Tusino initialed each of the twenty-two pages in the affidavit and also signed it after affirming under oath: 'I have read this statement consisting of 22 pages, including this page, I fully understand its contents, and I certify that it is true and correct to the best of my knowledge and belief.' " *Id.*

Carey also disagreed with the EPC's conclusion that Tusino did not refer Welk for a job because Welk's "name was too low on the out-of-work list." *Id.* Carey found that at the EPC hearing, "Tusino produced no evidence to support his claim that Welk would not have been called for work at Worthy Brothers because only the persons ahead of [Welk] on Bother Tusino's list were referred

for work." *Id.* Carey noted that "[t]he list referred to was not introduced into evidence and the undisputed testimony was that at least four separate lists existed, and that the lists were not always referred to." *Id.*

In addition, Carey disagreed with the EPC's conclusion that there was insufficient evidence in the record to substantiate the charge that Tusino and Valeri had operated Local 170's exclusive hiring hall in an arbitrary and discriminatory manner. Carey stated that Tusino "admitted at the NLRB hearing that he ... used a variety of subjective criteria in making referrals, none of them in writing, and made referrals for improper reasons." *Id.* at 7. Carey noted that "Tusino testified at the NLRB hearing that among the factors he considered in referring an individual was whether that person was a supporter of his." *Id.* Although the EPC had found that the record lacked evidence that members of Local 170 were harmed by Tusino's and Valeri's use of subjective referral criteria, Carey concluded that "members are necessarily harmed by the existence of a referral system that operates to reward supporters, relatives and friends with job referrals." *Id.* at 9.

Further, Carey rejected the EPC's finding that the record did not demonstrate that Tusino had engaged in nepotism. Carey found that the EPC incorrectly "relied on Brother Tusino's testimony that he refused to refer his own son-in-law to a job because [the son-in-law] had resigned from a well-paying job with a beer distributor as evidence that Brother Tusino did not engage in nepotism in making job referrals." *Id.* at 7. Carey found that "[a]lthough Brother Tusino testified before the EPC Panel that he initially refused to refer his son-in-law for work because [the-son-in-law] had quit his job, [Tusino] testified before the ALJ that he subsequently referred his son-in-law to a job with Worthy Brothers because [Tusino] was getting pressure from his daughter and wife." *Id.*

Accordingly, the General President's Decision rejected the EPC's recommendations, finding that "Brothers Tusino and Valeri have violated Article II, § 2(a), Article XIX, § 7(b)(1), (2) and (5) of the International Constitution and Article 7, § 11 and Article 14, § 4 of the Local 170 Bylaws by engaging in arbitrary and discriminatory work referrals and by engaging in nepotism and the appearance of nepotism in the referral of individuals to work in the construction industry." *Id.* at 9. The General President's Decision also found that "the preponderance of the reliable evidence establishes that Brother Tusino refused to refer Richard Welk for work because Brother Welk had filed charges with the NLRB, in violation of the same provisions in the IBT Constitution and Local Union Bylaws." *Id.* The General President's Decision imposed the following penalties on Tusino: "Brother Tusino is suspended from all offices, barred from serving in any representative capacity, and barred from seeking or accepting employment, including consulting work, with the IBT or any IBT affiliate for two years.... [and] Brother Tusino is also suspended from membership for three (3) months." *Id.* 9–10.

Tusino challenged the Decision of the General President in two ways. First, Tusino filed a protest with the Election Officer, who was appointed by this Court to oversee the 1995–1996 IBT International Union Delegate and Officer Elections ("1995–96 IBT Elections") pursuant to the provisions of the consent Order ("the Consent Decree") that the United States and the IBT entered into on March 14, 1989, in settlement of a civil RICO action that was brought before this Court. *See* 88 Civ. 4486. Second, Tusino filed the instant civil action in the United States District Court for the District of Massachusetts.

In the instant action, Tusino alleges that Carey's "administration has used extraordinary powers to simply eliminate political foes[,]" Verified Complaint ¶ 25, and that Carey imposed sanctions upon Tusino because Tusino supports James R. Hoffa, Jr. ("Hoffa"), who is an opposition candidate seeking the position of General President in the up-coming 1995–96 IBT Elections. Tusino claims that he "has been an ardent and vocal supporter of James R. Hoffa, Jr." *Id.* ¶ 6. Plaintiff alleges that Carey has engaged in "personal attacks on Plaintiff's reputation and [has attempted] to intimidate those members of Local 170 and the IBT who do

not support the Carey slate for General President." *Id.* ¶ 27. Tusino claims that Carey's actions violate the IBT Constitution; section 301 of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 185; and Title I of the Labor–Management Relations Disclosure Act ("LMRDA"), 29 U.S.C. §§ 411(a)(1), (a)(5). *See id.* ¶¶ 28–42. Tusino also brings a related, state-law claim for libel and slander. *See id.* ¶¶ 43–46. Tusino seeks money damages, and declaratory and injunctive relief.

Pursuant to Rule 65, Tusino brought a motion in the United States District Court for the District of Massachusetts, seeking a preliminary injunction. Tusino sought an injunction:

A) Prohibiting defendants from imposing the sanctions ordered against plaintiff pursuant to the decision of the General President dated March 14, 1996, wherein defendant Carey suspended plaintiff from all offices, barred plaintiff from serving in any representative capacity, barred plaintiff from seeking or accepting employment, including consulting work, with the IBT or any IBT affiliate for two years and suspending plaintiff from membership for three months;

B) Ordering that Plaintiff be immediately reinstated as a member of the New England Teamsters Pension Trustee Board; and

C) Suspending the Local 170 national delegate election until such time as the Office of the Election Officer investigates and makes a determination on Election Office Case No. P–639.

(Plaintiff's Notice of Motion at 1–2.)

Through a somewhat circuitous route, the instant case was transferred to this Court. On April 2, 1996, the Office of the United States Attorney for the Southern District of New York ("the Government") wrote a letter to the Honorable Nathaniel M. Gorton, United States District Judge for the District of Massachusetts ("Judge Gorton"), who was the judge assigned to the instant case. (Letter from Assistant United States Attorney Beth E. Goldman to the Honorable Nathaniel M. Gorton, United States District Judge for the District of Massachusetts (April 2, 1996)

(on file with the Clerk of the United States District Court for the Southern District of New York).) In this letter, the Government represented that the instant case should be transferred to this Court as related to the Consent Decree in *United States v. International Brotherhood of Teamsters, et al.,* 88 Civ. 4486. *Id.* The Government stated that "[i]n connection with [this Court's] administration of the Consent Decree, on January 17, 1990, Judge Edelstein issued an order pursuant to the All Writs Act, 28 U.S.C. § 1651, prohibiting all IBT-affiliated entities from litigating issues relating to the Consent Decree in any court or forum other than the Southern District of New York." *Id.* at 1–2. The Government asserted that "the *Tusino* litigation implicates the Consent Decree," *id.* at 2, and that the litigation should be transferred to this Court.

In a Memorandum and Order dated April 10, 1996, Judge Gorton stated that "[b]ecause plaintiff's Complaint and motion are based on allegations that the defendants have unlawfully attempted to impede the election campaigns of both the plaintiff and candidate Hoffa, this Court necessarily defers to the jurisdiction of the court that issued the 'All Writs Order.'" Memorandum and Order, 96–40056, at 4 (D.C.Mass. April 10, 1996). Accordingly, Judge Gorton ordered that the instant "case be transferred to the United States District Court for the Southern District of New York for further proceedings." *Id.* at 4–5.

Although Judge Gorton's Memorandum and Order specifically states that Judge Gorton reached his "determination after review of the 'All Writs Order' issued by United States District Judge Edelstein," *id.* at 4, the Clerk of the United States District Court for the Southern District of New York assigned the instant case to the Honorable Harold Baer, Jr., United States District Judge for the Southern District of New York ("Judge Baer"). On May 8, 1996, the Government wrote a letter to Judge Baer, requesting that the instant case be transferred to this Court. (Letter from Assistant United States Attorney Beth E. Goldman to the Honorable Harold Baer, Jr., United States District Judge for the Southern District of New York (May

8, 1996) (on file with the Clerk of the United States District Court for the Southern District of New York).) In an Order dated May 17, 1996, Judge Bear requested that the instant action "be transferred to Judge Edelstein" pursuant to Rule 16 of the Rules for the Division of Labor Among District Judges for the Southern District of New York. Order, 96 Civ. 2774 (May 17, 1996). In a memorandum dated May 23, 1996, the Case Processing Clerk for the United States District Court for the Southern District of New York reassigned the instant case to this Court.

While plaintiff's federal suit was in the process of being transferred to the appropriate forum, plaintiff continued to pursue the protest that he filed with the Election Officer. (Letter from Ernie Tusino, Local 170 Member to Office of the Election Officer ("Tusino's Election Protest") (March 15, 1996) (attached as exhibit # 5 to Verified Complaint).) In this protest, Tusino argued—as he argues in the instant suit—that Carey imposed disciplinary sanctions on Tusino in order to punish Tusino for Tusino's support of James Hoffa, Jr.:

> For the past four years I have been one of Mr. Carey's most vocal critics. At one point I was considering challenging him for the Presidency of this union. Early on, however, I decided to back the candidacy of James Hoffa and have made this fact well known to my members and to the union leadership.
>
> Carey's animus toward me grew as my opposition to his failed policies became more vocal and well known.
>
> I believed that Mr. Carey has conspired to prevent a Hoffa-backed delegate slate from winning in Local 170 and cooked up this phoney internal charge in order to eliminate me as a candidate.
>
> Under previous decisions reached by the Election Officer I believe that these charges are in retaliation for my campaign activities opposing Mr. Carey and supporting Mr. Hoffa.

Id. at 2. Tusino requested, among other things, that the Election Officer order Carey to withdraw Tusino's suspension and disqualify the "the Ron Carey delegates due to

Carey's unlawful intervention into the Local 170 electoral process." Id.

The Election Officer denied Tusino's protest, and Tusino appealed her decision to the Election Appeals Master that this Court appointed pursuant to the Consent Decree. On April 19, 1996, the Election Appeals Master held a hearing via teleconference. Decision of the Election Appeals Master, 96 Elec.App. 178(KC) at 1 ("EAM Decision") (April 24, 1996). On April 24, 1996, the Election Appeals Master issued a decision, affirming the Election Officer's decision in all respects. Id. at 4. This decision states that although Tusino and Valeri claimed that "Mr. Carey 'trumped up' the charges filed against them and their subsequent suspensions because of their campaign activities on behalf of Mr. Hoffa[,] [t]here is ... no objective evidence that this is, in fact, the case." Id. at 3. The Election Appeals Master found that Tusino had failed to present any evidence that Carey's decision to sanction Tusino was based on improper motivation. Id. Tusino did not appeal the decision of the Election Appeals Master to this Court.

With this labyrinthine procedural history in clear view, this Court turns to the business at hand—plaintiff's Rule 65 motion for a preliminary injunction.

## DISCUSSION

"In order to obtain a preliminary injunction, the moving party must show (1) the likelihood of irreparable injury, and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the movant's favor." *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 967 (2d Cir.1995) (citations omitted). The decision of whether to grant a motion for a preliminary injunction rests with the discretion of the district court. *See Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir.1994); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948 (2d ed. 1995).

Tusino contends that he will suffer irreparable injury if a preliminary injunction does not issue. Tusino argues that "[t]he preclu-

sion of a duly elected official from participating in the affairs of the union, and in particular precluding that elected officer from assuming his office, constitutes irreparable harm *per se*." (Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction ("Plaintiff's Memo") at 5.) Plaintiff asserts that "[m]ore than the plaintiff's salary is at stake, and reinstatement at some future date will not remedy the intervening harm to the Plaintiff, his slate, his nominators, the members of Local 170 that elected him and the remaining members of Local 170 whose expectation is that Plaintiff will be allowed to take office as part of the self governance of Local 170." *Id.* at 6.

Tusino further argues that he is likely to succeed on the merits because the General President's Decision to sanction Tusino "ignored the unanimous decision of the EPC" which "totally exonerated" Tusino. *Id.* at 9. Tusino further asserts that the timing of Carey's decision to sanction Tusino "is suspect on its face." *Id.* Tusino argues that "though Carey was aware of the findings of the EPC for nine months, he waited until 1) five days after the ballots for national delegate were mailed to the rank and file of Local 170, 2) two weeks after Plaintiff accompanied Hoffa on a well publicized campaign swing through Massachusetts, and 3) such time as Carey knew that Plaintiff would be out of state, to launch a blind side attack on Plaintiff." *Id.* Tusino also argues that the March 14, 1996, General President's Decision, which sanctioned Tusino, is null and void because it is time barred. *Id.* at 10. Tusino asserts that Rule 8.a. of the EPC Rules requires the General President to impose any sanctions within sixty days of receiving a report from the EPC. *Id.* Tusino claims that because "Carey did not issue the Decision of the General President until March 14, 1996, more than 70 days after receiving the signed EPC Report," the sanctions that Carey imposed on Tusino are null and void. *Id.*

Tusino also contends that the equities in the instant case favor granting an injunction. *Id.* at 11. Tusino supports this contention by stating: "Plaintiff has certainly raised sufficiently serious issues going to the merits to make them fair ground for litigation and a tipping of the equities decidedly in favor of granting preliminary relief." *Id.* at 11.

In opposition to the instant motion, defendants Carey and the IBT claim that Tusino has failed to demonstrate a likelihood of success on the merits. Defendants argue that Tusino "offers no facts in support of his claim of bias other than the fact that Carey did not follow the recommendations of the EPC panel." (Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction with Supporting Memorandum of Reasons ("Defendants' Memo") at 14.) Defendants contend that Tusino's claim that Carey acted out of bias in issuing the General President's Decision is undermined by the fact that Judge Linsky "an independent and presumptively unbiased decision maker" found that Tusino had engaged in misconduct. *Id.* Defendants assert that Judge Linsky "relying principally on Tusino and Valeri's own clear and unequivocal testimony and admissions in sworn affidavits, found that Tusino and Valeri had operated an illegal hiring hall, wherein individuals were referred to jobs based on their familiar relationship to and/or their political support of Tusino." *Id.* Defendants argue that because "Carey's decision is based on the very same evidence, no inference of bias is supportable." *Id.* at 15. Moreover, defendants contend that plaintiff has failed to show a likelihood of success on the merits in the instant case because "the law is clear that a plaintiff must have specific evidence of bias to support a procedural due process claim under Title I of the Landrum–Griffin Act" and "Tusino has no such specific evidence of bias." *Id.* at 16.

Defendants challenge Tusino's assertion that the timing the General President's Decision indicates that Carey was biased against Tusino. *Id.* at 15. Defendants argue that "there is no evidence that General President Carey was aware of the panel's finding for nine months." *Id.* Defendants assert "the record shows that the panel's Findings and Recommendations were not fully executed until January 1996," *id.,* less than three months prior to the issuance of the General President's Decision.

Defendants also challenge Tusino's claim that the Decision of the General President is null and void because it is time barred. Defendants argue that the EPC Rules and Regulations—which established the sixty-day time limit for the General President to file a decision—cannot substantiate petitioner's claim under § 301 of the LMRA, 29 U.S.C. § 185, because the EPC Rules and Regulations did not amend the IBT Constitution. *Id.* at 16. Defendants assert that "Tusino has not and cannot cite to the Court any decisions where something other than a Union's Constitution have formed the jurisdictional basis for a § 301 claim." *Id.*

In addition, defendants contend that Tusino "makes no substantive argument" that the balance of the equities in the instant case favors issuing an injunction. *Id.* at 19. Defendants argue that the equities do not favor plaintiff in light of "the clear federal policy of non-interference in the internal affairs of unions ... and the decision of an independent and presumptively unbiased federal administrative law judge who found that Tusino had engage in conduct that unquestionably violates the International Constitution." *Id.*

■ As an initial matter, this Court holds that plaintiff's request for an order "[s]uspending the Local 170 national delegate election until such time as the Office of the Election Officer investigates and makes a determination on [the protest that plaintiff filed with the Election Office]," (Plaintiff's Notice of Motion at 1), must be denied as moot. The protest that plaintiff filed with the Election Office has already been decided. Not only has the protest been decided, but Tusino has appealed the Election Officer's decision, and the Election Appeals Master has already decided Tusino's appeal, affirming the decision of the Election Officer. In fact, both the Election Officer and the Election Appeals Master issued there respective decisions before the instant case was even placed on this Court's docket. As it is now a practical impossibility for this Court to issue an injunction suspending the Local 170 national delegate election until the Election Officer decides Tusino's election protest, the instant motion seeking such an injunction must be denied as moot.

Moreover, this Court denies as meritless plaintiff's motion seeking an injunction that both prohibits defendants from imposing the sanctions that were ordered in the General President's Decision and that mandates that plaintiff be immediately reinstated to the positions he previously held in the IBT. As previously discussed, in this circuit, a district court employs a two-prong test in determining whether a preliminary injunction should issue: "the moving party must show (1) the likelihood of irreparable injury, and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the movant's favor." *Tough Traveler*, 60 F.3d at 967. The instant motion is flawed because plaintiff has failed to show either a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. Because plaintiff has failed to satisfy the second prong of the test for a preliminary injunction, plaintiff's Rule 65 motion is denied, and the Court sees no need to consider the further argument of irreparable injury.

■ Plaintiff has failed to make a showing that he is likely to succeed on the merits of the underlying dispute because plaintiff has failed to present evidence that the General President's Decision was the result of bias. The gravamen of Tusino's claim is that Carey's decision to sanction Tusino violated Tusino's due process rights, as guaranteed by 29 U.S.C. § 411, because Carey acted out of bias against Tusino. Yet, in order to substantiate such a claim under 29 U.S.C. § 411, Tusino must present specific evidence of bias. *Ferguson v. International Ass'n of Bridge, Structural and Ornamental Iron Workers*, 854 F.2d 1169, 1177 (9th Cir.1988); *Frye v. United Steelworkers of America*, 767 F.2d 1216, 1225 (7th Cir.), *cert. denied*, 474 U.S. 1007, 106 S.Ct. 530, 88 L.Ed.2d 461 (1985). In the instant case, Tusino has sought to substantiate his argument by speculating about Carey's motives, asserting that Carey chose to impose sanctions because Tusino supports the candidacy of James Hoffa, Jr.— who is opposing Carey in the up-coming election for General President of the IBT. Such

speculation, however, is no substitute for specific evidence.

Although Tusino claims that "[t]he timing of Carey's Decision and the suspension of Plaintiff is [sic] suspect on its face," (Plaintiff's Memo at 9), once again Tusino has failed to produce any specific evidence that would demonstrate that Carey acted out of bias. Tusino states that "[t]he signed EPC Report was not forwarded to Defendant Carey until January 4, 1996," and that the Decision of the General President was issued on March 14, 1996.[1]  *Id.* at 10. Tusino argues that Rule 8.a. of the EPC Rules requires Carey to issue a Decision of the General President "within 60 days" and that Carey waited beyond this sixty-day period in order to damage both Tusino's and Hoffa's IBT campaigns. This argument, however, is flawed in two respects. First, although Tusino has demonstrated that the General President's Decision was issued approximately ten days after the deadline imposed by EPC Rule 8.a., it is apparent that this decision would have had largely the same negative impact on Tusino's political aspirations if it had been issued within the time-period established by the EPC Rules. Thus, this Court disagrees with Tusino's claim that the timing of the General President's Decision is *prima facie* evidence of bias. Second, Tusino's claim regarding the timing of the General President's Decision is based on Tusino's speculation regarding Carey's motives, and thus is no substitute for the specific evidence of bias that Tusino must produce to substantiate his claim.

In addition, plaintiff's claim that he will likely succeed in demonstrating that the General President's Decision was based on bias is undermined by the fact that Judge Linsky found that Tusino's actions violated federal labor law. Although the EPC declined to follow Judge Linsky's decision, the General President's Decision found that the record of the proceeding before Judge Linsky proved by a preponderance of the reliable evidence that Tusino brought reproach upon the IBT. General President's Decision at 9. Thus, as defendants have argued, Carey's decision is supported by "a decision on the merits of the internal charges against Tusino written by [Judge Linsky who is] an independent and presumptively unbiased decision maker." (Defendants' Memo at 14.) Given that Judge Linsky and the EPC reached differing conclusions regarding whether there was sufficient evidence showing that Tusino had engaged in improper labor practices, Tusino has failed to demonstrate that he will likely be able to show that Carey acted out of bias in agreeing with Judge Linsky's reasoning, rather than the EPC's reasoning.

Moreover, in light of the respective rulings by the Election Officer and the Election Appeals Master, it appears that Tusino is unlikely to succeed on the merits of the underlying dispute. As previously mentioned, Tusino challenged Carey's imposition of sanctions both by filing the instant suit and by filing a protest with the Election Officer. After the Election Officer denied Tusino's protest, Tusino appealed to the Election Appeals Master. In a decision dated April 24, 1996, the Election Appeals Master affirmed the decision of the Election Officer, finding that the was "no objective evidence" that Carey's decision to sanction Tusino was the result of bias. In the instant action, Tusino brings largely the same claims that he brought before the Election Officer and the Election Appeals Master. Because Tusino failed to provide either the Election Officer or the Election Appeals Master with any specific evidence of Carey's alleged bias, it is

---

1. Tusino also asserts that "though Carey was aware of the findings of the EPC for nine months," he waited to issue the General President's Decision until it would do the most harm to Tusino. (Plaintiff's Memo at 9.) Tusino entirely fails to explain the basis of his claim that Carey was aware of the EPC's findings for nine months. In addition, Tusino apparently contradicts this statement on the very next page of his memorandum of law when he asserts that "[t]he signed EPC Report was not forwarded to Defen-

dant Carey until January 4, 1996," and "Carey did not issue the Decision of the General President until March 14, 1996." *Id.* at 10. Moreover, defendants contend that "there is no evidence that General President Carey was aware of the [EPC's] findings for nine month." (Defendants' Memo at 15.)

Plaintiff's claim that Carey was aware of EPC's decision for nine months is utterly unsupported by any evidence in the record and therefore is not evidence of bias.

unlikely that Tusino will be able to produce specific evidence of bias in the instant case.

■ This Court also finds that plaintiff has failed to demonstrate that he is likely to succeed in arguing that the General President's Decision is null and void because it was issued after the sixty-day time limit prescribed by EPC Rule 8.a. (*See* Plaintiff's Memo at 10.) Plaintiff cites no authority in support of this argument. In contrast, defendants cite authority supporting their argument that Tusino cannot substantiate a claim under § 301 of the LMRA, 29 U.S.C. § 185, by alleging that Carey violated the EPC Rules. (Defendants' Memo at 16–17.) Plaintiff has made no attempt to rebut defendants' argument. Accordingly, this Court finds that Tusino has not shown that he will likely succeed on the merits of his claim that the General President's Decision is null and void.

■ Tusino also has failed to show that there are sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the his favor. In his memorandum of law, Tusino raises no argument on this point, relying instead on a conclusory statement that he "has certainly raised sufficiently serious issues going to the merits to make them fair ground for litigation and a tipping of the equities decidedly in favor of granting preliminary relief." (Plaintiff's Memo at 11.)

Although any claim of impropriety in the 1995–96 IBT Election raises an issue of grave concern to this Court, counsel's conclusory statement is no substitute for argument. Plaintiff's counsel has made no attempt to identify any "sufficiently serious questions going to the merits." In fact, as the foregoing discussion shows, plaintiff not only has failed to make a showing of likely success on the merits but also repeatedly has failed to produce the specific evidence of bias needed to challenge the General President's Decision. Further, plaintiff's counsel makes no attempt to demonstrate that the balance of the equities tips in favor of plaintiff—let alone, that this balance tips decidedly in plaintiff's favor. In seeking injunctive relief from this Court, Tusino's counsel bore the responsibility of presenting for this Court's consideration the arguments that would warrant the grant of equitable relief. In the instant "argument," plaintiff's counsel has shirked this responsibility. The record before this Court does not demonstrate that there are sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in Tusino's favor.

■ Furthermore, this Court declines to exercise its discretion to grant an injunction because plaintiff has not abided by the procedures that govern protests in the 1995–96 IBT Elections. Tusino failed to follow these procedures because the instant motion is not brought as an appeal from the Decision of the Election Appeals Master.

Plaintiff's failure to appeal the Decision of the Election Appeals Master is contrary to the procedures for bringing an election protest as set forth in the Rules for the 1995–1996 IBT International Union Delegate and Officer Election ("Election Rules") and this Court's Order of March 22, 1996. *United States v. International Bhd. of Teamsters,* 921 F.Supp. 1076 (S.D.N.Y.1996). In an Opinion and Order dated August 22, 1995, this Court approved in their entirety the Election Rules that were promulgated by the Election Officer. *United States v. International Brotherhood of Teamsters,* 896 F.Supp. 1349 (S.D.N.Y.1995). Article XIV of the Election Rules sets forth protest and protest-appeal procedures. This Article governs a variety of election protests, including "[p]rotests regarding . . . retaliation for the exercise of rights protected by the *Rules.*" Election Rules, Art. XIV, sec. 2(b)(5). Article XIV also establishes procedures for appealing decisions of the Election Officer. After the Election Officer issues a decision, "[t]he complainant(s), the Union(s) involved, any adversely affected candidate(s), or any other person who or entity which is aggrieved by the determination of the protest may . . . request a hearing before the Election Appeal Master." Election Rules, Art. XIV, sec. 2(i).

Pursuant to an Order of this Court, dated February 7, 1995, the Election Appeals Master shall resolve any disputes about the conduct and/or results of the 1995–96 IBT Elections. *See* Order, 88 Civ. 4486 at 3 (Feb. 7,

1995) ("The duty that Paragraph 12(D)(ix) of the Consent Decree imposed upon the Independent Administrator, to 'hear disputes about the conduct and/or results of elections,' is hereby conferred upon an Election Appeals Master to be appointed by the Court."); Consent Decree ¶ 12(D)(ix) ("Any disputes about the conduct and/or results of elections shall be resolved after hearing by the Administrator.") The Election Rules provide that the Election Appeals Master's Decision "shall be effective and binding as of its issuance unless it is stayed or overturned by the Court." Election Rules, Art. XIV, sec. 2(1). This Court's March 22, 1996, Order states that "parties to an appeal before the Election Appeals Master may seek review by this Court of the Election Appeals Master's decision by filing an appeal of such decision with this Court within fourteen (14) calendar days of issuance of the Election Appeals Master's decision." 921 F.Supp. at 1077.

These various rules prescribe a specific set of procedures for election protests because the oversight of the 1995–96 IBT Elections is a herculean task. To date, the Election Officer has received 1,096 protests, each of which requires a prompt decision. Moreover, the Election Appeals Master has issued 195 written decisions on appeals from decisions of the Election Officer. In order to resolve this vast number of election protests quickly, fairly, efficiently, and in a consistent fashion, it is essential that such protests be directed to the Court-appoint officers who bear the responsibility of ensuring that the 1995–96 IBT Elections are conducted in a fair, open, and honest fashion.

In the instant case, Tusino failed to bring his request for injunctive relief as an appeal from a Decision of the Election Appeals Master. Tusino's allegations are properly the subject of an election protest because Tusino claims that Carey has retaliated against Tusino because of Tusino's "exercise of rights protected by the *Rules*," Election Rules, Article XIV, section 2(b)(5), namely the right to support, and campaign for, the candidate of his choice. Indeed, apparently recognizing this fact, Tusino filed a protest with the Election Officer. Moreover, Tusino also exercised his rights under the Election Rules by appealing the Election Officer's Decision to the Election Appeals Master. After the Election Appeals Master affirmed the Election Officer's denial of Tusino's protest, however, Tusino did not appeal the Election Appeals Master's Decision to this Court. Rather, eschewing the procedures established by the Election Rules and this Court's March 22, 1996, Order, Tusino sought relief from this Court by pursuing the motion for a preliminary injunction that he had filed before the instant case was transferred to this Court.

Because Tusino's motion for a preliminary injunction is predicated on the claim that Carey has retaliated against Tusino because of Tusino's support of Hoffa, Tusino's failure to bring this claim as an appeal from a Decision of the Election Appeals Master warrants a denial of the requested injunctive relief. Tusino's motion for a preliminary injunction should be denied in order to ensure that the 1995–96 IBT Election process continues in an orderly fashion. As previously stated, to date, the Election Officer has received 1,096 election protests, and the Election Appeals Master has decided 195 appeals. Each of these protests and appeals could form the basis of an application for injunctive relief that would be brought before this Court. This potential deluge of applications would create a grave threat that the 1995–96 IBT Elections would become bogged down in a quagmire of litigation that would hinder the Consent Decree's goal of ensuring fair, open, and honest IBT elections. This Court has established the procedures for bringing election protests in order to avoid this very problem, and litigants who seek equitable relief from this Court should abide by the procedures that this Court has established.

Finally, it must be noted that the papers that plaintiff submitted to this Court do not conform with the Local Rules or this Court's Individual Rules. This Court repeatedly has emphasized the importance of complying with these rules and has rejected papers that fail to comply. Because the instant motion was filed prior to the transfer of the instant case from the United States District Court for the District of Massachusetts, however, it would be inappropriate to penalize plaintiff

for failure to comply with the Local Rules or this Court's Individual Rules. Now that the instant case is before this Court, counsel is advised that all future submissions must comply strictly with the Local Rules and this Court's Individual Rules.

## CONCLUSION

For all the foregoing reasons, plaintiff's Rule 65 motion for a preliminary injunction is DENIED WITH PREJUDICE.

SO ORDERED.

### MEMORANDUM & ORDER ON RECONSIDERATION

In an Opinion and Order dated June 6, 1996, this Court denied plaintiff Ernest Tusino's ("Tusino" or "plaintiff") Federal Rule of Civil Procedure 65 motion for a preliminary injunction. *See Tusino v. International Bhd. of Teamsters, et al.,* 928 F.Supp. 319 (S.D.N.Y.1996). For the purposes of the instant Memorandum and Order, familiarity with the facts of this Court's June 6, 1996, Opinion and Order is assumed.

Although this Court denied plaintiff's motion on the ground that he had failed to satisfy the legal standard for obtaining a preliminary injunction, this Court further declined "to exercise its discretion to grant an injunction because plaintiff has not abided by the procedures that govern protests in the 1995–96 [International Brotherhood of Teamsters International Union Delegate and Officer Election]." *Id.* at 330. This Court noted that "Tusino failed to bring his request for injunctive relief as an appeal from a Decision of the Election Appeals Master." *Id.* at 331. This Court stated that "Tusino's motion for a preliminary injunction should be denied in order to ensure that the 1995–96 IBT Election process continues in an orderly fashion." *Id.* This Court noted that "to date, the Election Officer has received 1,096 election protests, and the Election Appeals Master has decided 195 appeals." *Id.* This Court expressed concern that if an aggrieved party to the 1995–96 IBT Elections were free to disregard the protest-procedures established by this Court, then "[e]ach of these protests and appeals could form the basis of an appli-

cation for injunctive relief that would be brought before this Court." *Id.* This Court found that "[t]his potential deluge of applications would create a grave threat that the 1995–96 IBT Elections would become bogged down in a quagmire of litigation that would hinder the Consent Decree's goal of ensuring fair, open, and honest IBT elections." *Id.* Accordingly, this Court denied plaintiff's motion.

By letter dated June 18, 1996, Election Officer Barbara Zack Quindel ("the Election Officer") has informed the Court that the references to 1,096 election protests in this Court's June 6, 1996, Opinion and Order are inaccurate. (Letter from Barbara Zack Quindel, Election Officer to the Honorable David N. Edelstein, United States District Judge for the Southern District of New York (June 18, 1996) (on file with the Clerk of the United States District Court for the Southern District of New York).) The Election Officer states that "[t]his information was conveyed to the Court by a staff member in my office prior to my review of protest statistics that were being compiled." *Id.* She further states that "[h]aving reviewed those protest statistics, I want to advise the Court that as of the date of the Order, June 6, 1996, the Election Officer had, in fact, received 955 protests." *Id.* The Election Officer then apologized "for this error in communication." *Id.*

Because this Court's June 6, 1996, Opinion and Order contains inaccurate information, it is appropriate to reconsider, *sua sponte,* plaintiff's Rule 65 motion. After reconsidering plaintiff's motion in light of the new information provided by the Election Officer, this Court holds that plaintiff's Rule 65 motion should be denied for all of the reasons stated in this Court's June 6, 1996, Opinion and Order. Although that opinion incorrectly cites 1,096 election protests, when the accurate number is 995, the concerns that this Court expressed in the June 6, 1996, Opinion and Order remain unchanged. If an aggrieved party to the 1995–96 IBT Elections were free to disregard the procedures that this Court established for the disposition of election protests, then each of the 995 protests received by the Election Officer and

the 195 appeals decided by the Election Appeals Master could form the basis for a motion for a preliminary injunction. Although this number of potential applications is less than the number cited in this Court's June 6, 1996, Opinion and Order, this number, nevertheless, creates the threat of a potential deluge of litigation. To avoid this problem, this Court will not exercise its discretion to grant a motion for a preliminary injunction to a party that has failed to adhere to the rules that this Court established for bringing election protests.

IT IS HEREBY ORDERED THAT upon reconsideration of plaintiff's motion for a preliminary injunction, plaintiff's Rule 65 motion is DENIED WITH PREJUDICE.

IT IS FURTHER ORDERED THAT this Court's June 6, 1996, Opinion and Order is MODIFIED to reflect the accurate number of election protests received by the Election Officer—995 protests.

SO ORDERED.