**TOUGH TRAVELER, LTD.,**
**Plaintiff–Appellee,**

v.

**OUTBOUND PRODUCTS, Taymor Industries, Ltd., and Taymor Industries, U.S.A., Inc., Defendants–Appellants.**

No. 1691, Docket 94–9286.

United States Court of Appeals,
Second Circuit.

Argued May 22, 1995.

Decided July 21, 1995.

Paul C. Rapp, Albany, NY (Susan E. Farley, Nicholas Mesiti, Heslin & Rothenberg, Albany, NY, on the brief), for plaintiff-appellee.

Barry G. Magidoff, New York City (Paul J. Sutton, Sutton, Basseches, Magidoff & Amaral, Reid & Priest, New York City, on the brief), for defendants-appellants.

Before VAN GRAAFEILAND, KEARSE, and JACOBS, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Outbound Products *et al.* (collectively "Outbound") appeal from an order of the United States District Court for the Northern District of New York, Con. G. Cholakis, *Judge,* in this action brought for trade dress infringement in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Supp. IV 1992) ("Lanham Act" or "Act"), and state-law unfair-competition principles, granting the motion of plaintiff Tough Traveler, Inc. ("Tough Traveler"), for a preliminary injunction against defendants' sales of certain allegedly infringing products. On appeal, Outbound contends principally that the injunction was improperly granted because the district court failed to conduct a hearing on the motion and did not apply the correct legal standards. Because we agree that the court did not apply the correct legal standard with respect to whether Tough Traveler had shown a likelihood of irreparable injury, we conclude that the granting of the injunction was an abuse of discretion, and we therefore vacate and remand for further proceedings.

## I. BACKGROUND

Tough Traveler is a manufacturer and seller of, *inter alia,* backpacks and child carriers. Outbound Products, a division of defendants Taymor Industries, Ltd., and Taymor Industries, U.S.A., Inc. (collectively "Taymor"), also sells child carriers. According to the complaint, filed in April 1994, Tough Traveler began in 1984 to design, manufacture, and market a backpack-type child carrier referred to as the "Kid Carrier." The complaint alleges that the Kid Carrier, a high quality product, incorporates many inherently distinctive, nonfunctional design features and that, as a result of widespread advertising and promotion, the Kid Carrier has come to be identified by consumers as a Tough Traveler product. The complaint asserts that Outbound copied Tough Traveler's Kid Carrier; that it caused cheaper, inferior, and confusingly similar child carriers to be manufactured abroad; and that it sold the Outbound carriers in the United States in competition with Tough Traveler. It alleges that Outbound's products infringe Tough Traveler's trade dress in violation of the Lanham Act and state unfair-competition laws, and that, "[u]pon information and belief, such acts have already caused confusion, mistake and deception," causing Tough Traveler injury in excess of $300,000.

Outbound filed an answer admitting that it sells a child carrier, which it calls the "Toddler Tote," but denying most of the other material allegations of the complaint.

In August 1994, Tough Traveler moved for a preliminary injunction forbidding Outbound to sell the Toddler Tote or similar child carriers. The motion was supported chiefly by the affidavits of Tough Traveler's president Nancy Gold; its production and purchasing manager Christine Gauss; and a merchant, Joseph Raftis. Gold stated, *inter alia,* that she had seen sporting goods manufacturers/retailers who had confused the Outbound and Tough Traveler child carriers. Raftis stated that customers in his store had likewise been confused. Gauss stated, *inter alia,* that in February 1994, she had met a Mr. S.K. Choe, who said his company manufactured Outbound's child carrier in Korea, that "Outbound had sent him 'a Tough Trav-

eler [child] carrier to make,' and that he essentially made a duplicate of the Tough Traveler carrier modifying it only slightly" (Affidavit of Christine Gauss dated August 3, 1994, ¶ 7). Gauss also stated that, according to Choe, Outbound's product is inferior to the Kid Carrier. Because of the lower cost resulting from its foreign manufacture and its inferior materials, Outbound's Toddler Tote was sold at a lower price than the Kid Carrier.

Outbound opposed the motion on various grounds. It submitted, *inter alia,* the affidavit of a Taymor vice president disputing the Gold affidavit's assertions with respect to public perceptions and the likelihood of confusion; stating that Taymor's records did not indicate that Raftis had ever received the Toddler Tote to sell in his stores; and denying that Outbound's child-carrier products had ever been supplied by Choe or Choe's company.

Outbound also contended that Tough Traveler's motion was unduly belated. In support of this contention, it submitted, *inter alia,* the affidavit of its sales manager Phillip K. Brown, who said that Gold had called him, inquiring about Outbound's sales of the Toddler Tote, no later than the early or middle part of 1993. Outbound also submitted the affidavit of one Bill Chandler, an independent sales representative for several manufacturers of outdoor products including Outbound, and formerly including Tough Traveler. Chandler stated that Gold had inquired about Outbound's child carrier after she saw it at a February 1993 trade show. Chandler also stated that he did not regard the Outbound and Tough Traveler child carriers as confusingly similar.

Gold replied with a second affidavit, stating that she had no recollection of seeing the Outbound child carrier prior to mid-summer of 1993. She stated that prior to that time, however, Chandler had told her that defendants had copied the Tough Traveler carrier. Gold also stated that after seeing the Outbound carrier, she had been unsure whether there were any sales in the United States, but that just before Tough Traveler filed its injunction motion, she had learned of defen-

dants' intention to reorder child carriers for distribution in the United States.

The district court, without holding a hearing, granted Tough Traveler's motion for a preliminary injunction. In a Memorandum Decision and Order dated September 23, 1994, the court found that the overall appearance of Tough Traveler's carrier was inherently distinctive and that Tough Traveler had raised sufficiently serious questions going to the likelihood of confusion. The court also found the likelihood of irreparable injury established because

> speculation as to the amount of lost sales, the future inability to accurately account for the amount of such lost sales, and the uncertain results of consumer confusion, represent unknown and incalculable damages. Accordingly, if defendant restocks its inventory of the allegedly infringing product and is permitted to market that inventory, irreparable harm will occur.

*Id.* at 3 n. 3. Based on this finding of potential irreparable harm, and "in consideration of the parties' respective sales volumes for child carriers," *id.* at 5 n. 5, the court concluded that the balance of hardships tipped in favor of Tough Traveler.

The district court denied a motion by Outbound for reconsideration, which included a request for an oral hearing. This appeal followed.

## II.  DISCUSSION

On appeal, Outbound contends that the preliminary injunction should be vacated principally because the district court (1) failed to hold a hearing or permit oral argument before issuing the injunction; and (2) applied incorrect legal standards, in that (a) in assessing the distinctiveness of Tough Traveler's trade dress, it failed to consider the difference between trade dress based on packaging configuration and that based on product configuration, (b) in assessing the likelihood of confusion, it relied on aspects of similarity that are based on the functional requirements of the product, and (c) in assessing the potential for irreparable injury, it failed to consider Tough Traveler's tardiness in seeking an injunction. We find merit in

the last contention and need not discuss the others.

■ The Lanham Act makes it unlawful for a seller of goods to use "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" which "is likely to cause confusion ... as to the origin" of the goods. 15 U.S.C. § 1125(a)(1). The Act also protects the "trade dress" of a product, which involves its "total image ... includ[ing] features such as size, shape, color or color combinations, texture, or graphics." *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 75 (2d Cir.1985) (internal quotes and alterations omitted). To prevail on a claim of trade dress infringement, a plaintiff must establish (1) that its trade dress is distinctive either (a) because it is inherently so or (b) because it has acquired secondary meaning, and (2) that a likelihood of confusion exists between its product and the defendant's product. *See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992).

■ In order to obtain a preliminary injunction, the moving party must show (1) the likelihood of irreparable injury, and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the movant's favor. *See, e.g., Fisher–Price, Inc. v. Well–Made Toy Manufacturing Corp.,* 25 F.3d 119, 122 (2d Cir. 1994); *Bourne Co. v. Tower Records, Inc.,* 976 F.2d 99, 101 (2d Cir.1992); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir. 1985). In a trademark case, irreparable injury may be found "where 'there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.'" *Joseph Scott Co. v. Scott Swimming Pools, Inc.,* 764 F.2d 62, 66 (2d Cir.1985) (quoting *McGregor–Doniger, Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1130 (2d Cir.1979)). When a plaintiff has shown a "high probability of confusion," there is normally a presumption of irreparable harm because

> [w]hile an injured plaintiff would be entitled to recover the profits on the infringing

items, this is often difficult to determine; moreover, a defendant may have failed to earn profits because of the poor quality of its product or its own inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult.... Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Omega Importing Corp. v. Petri–Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir.1971); *see also Fisher–Price, Inc. v. Well–Made Toy Manufacturing Corp.,* 25 F.3d at 124.

■ Nonetheless, any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief. *See generally id.* (suit); *Majorica, S.A. v. R.H. Macy & Co.,* 762 F.2d 7, 8 (2d Cir.1985) (per curiam) (suit and motion); *Citibank, N.A. v. Citytrust,* 756 F.2d at 276–77 (suit). Though such delay may not warrant the denial of ultimate relief, it may, "standing alone, ... preclude the granting of preliminary injunctive relief," *Majorica, S.A. v. R.H. Macy & Co.,* 762 F.2d at 8, because the "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury," *Citibank, N.A. v. Citytrust,* 756 F.2d at 277 (internal quotes omitted); *see also Fisher–Price, Inc. v. Well–Made Toy Manufacturing Corp.,* 25 F.3d at 124. Although delay may not negate the presumption of irreparable harm if the delay was caused by the plaintiff's ignorance of the defendant's competing product or the plaintiff's making good faith efforts to investigate the alleged infringement, *see id.,* if it is not so explainable, "delay alone may justify denial of a preliminary injunction," *Citibank, N.A. v. Citytrust,* 756 F.2d at 276 (delay of suit for nine months after receiving notice in the press, and 10 weeks after receiving actual notice, negates any presumption of irreparable harm).

■ Tough Traveler commenced the present action in April 1994. While there is some disagreement as to precisely when it had first seen Outbound's Toddler Tote, Tough Traveler's president admitted to having been aware of that competing product no later than the middle of 1993. Thus, Tough Traveler waited at least nine months to commence the present law suit. After commencing the action, Tough Traveler waited some four months longer—*i.e.,* more than a year after learning of the alleged infringement—before moving for a preliminary injunction. There has been no suggestion that these delays were attributable to Tough Traveler's pursuit of further investigation of the alleged infringement. In its brief on this appeal, Tough Traveler states that "since Outbound's sales of child carriers occur between January and June of the calendar year, at the time Tough Traveler saw Outbound's infringing carrier no child carrier sales were being made." Even this rationale, which presumably was directed at the 1993 selling season, since Gold admits she saw the Toddler Tote in mid–1993, cannot explain why Tough Traveler allowed what it would presumably view as Outbound's entire 1994 selling season to pass, waiting until August 1994 to seek preliminary injunctive relief.

The district court, without discussion of the timing of Tough Traveler's steps to protect its trade dress, adopted the general presumption of irreparable injury notwithstanding Tough Traveler's manifest delay in bringing the action and in making the motion. We conclude that, given the leisurely pace of Tough Traveler's pursuit of the matter, the court's reliance on the general presumption was a misapplication of the law.

## CONCLUSION

As to the issue of irreparable harm, we have considered all of Tough Traveler's appellate contentions and have found them unpersuasive. We express no view on the merits of the parties' contentions with respect to the other issues in the action. The order of the district court granting the preliminary injunction is vacated and the matter remanded to that court for further proceedings.

The costs of this appeal shall abide the ultimate outcome of the action.

JACOBS, Circuit Judge, concurring in the result:

I concur in the result and write separately because I think the tendency of the majority opinion is to create an inflexible rule that may preclude the issuance of a preliminary injunction in every case of trade dress infringement where the party seeking the injunction has inexcusably delayed seeking preliminary relief. Contrary to the majority, I conclude that we should accept the district court's findings on irreparable injury and that we should reverse on the ground that the district court abused its discretion in finding that plaintiff demonstrated a likelihood of success on the ultimate merits. In particular, I conclude that the similarities between the Tough Traveler and Outbound child carriers are functional, and that the different trademarks displayed in the same prominent spot on both products avoid confusion.

I

The presumption of irreparable harm, as the majority states, is inoperative if the plaintiff has delayed in either bringing suit or in moving for a preliminary injunction, *see Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir.1985); but the district court *did not* rely on this presumption in granting the injunction. Rather, as the draft acknowledges, *ante* at 967, the district court made findings that Tough Traveler would suffer irreparable injury because

> speculation as to the amount of lost sales, the future inability to accurately account for the amount of such lost sales, and the uncertain results of consumer confusion, represent unknown and incalculable damages. Accordingly, if defendant restocks its inventory of the allegedly infringing product and is permitted to market that inventory irreparable harm will occur.

These are sufficient findings in themselves to support the district court's *finding* of irreparable injury. There was no impermissible reliance on the *presumption*.

The majority relies on *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir.1985), for the proposition that "[s]ignificant ... delay alone *may* justify denial of a preliminary injunction...." *Id.* at 276 (emphasis added). The *Citibank* opinion also cautions that "[d]elay in seeking enforcement of those rights ... tends to indicate at least a reduced need for such drastic, speedy action." *Id.* Thus *Citibank* does not preclude preliminary relief even if the district court finds unexcused delay. Delay is just one of several factors to consider. In *Citibank*, we vacated the injunction and remanded for further proceedings because the district court had failed adequately to address the "irreparable injury" issue, and had instead relied solely on the presumption of irreparable injury applicable in trademark cases.

I appreciate that the findings made by the district court here echo the irreparable injuries deemed by this Court to justify the presumption: the difficulty of calculating the infringer's illegal profits and the plaintiff's lost business, and the irreparable loss of customers to products of other competitors. *See Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971). However, that is the likely list of considerations available to support an inference of irreparable harm in the absence of a presumption. In this case the district court expressed these considerations as findings. Under the circumstances, they are not clearly erroneous. If the making of such findings is deemed tantamount to invoking the presumption, it is difficult to see what findings could ever be sufficient to overcome or counteract an unexcused delay.

In short, *Citibank* held that the presumption of irreparable injury does not apply in circumstances of unexcused delay; the tendency of the majority opinion is to make the contrary presumption irrebuttable in such circumstances.

II

Although I respectfully disagree with the majority on the irreparable injury issue, I concur in the result because, although the child carriers created by Outbound and Tough Traveler resemble each other, the re-

semblance is caused by features that are purely functional.

The appendix filed in this appeal includes full-color photographs of the two products. At oral argument the parties provided the court with sample child carriers for examination. Other than the difference between their logos, the products are generally similar. The plaintiff alleged, and the district court found, that the similarities include "the lightweight, narrow and slim design," which "contribut[es] to" the carriers' "overall look and appearance[,] [a] vertical stripe on the seats and back, ... shaped side flaps, a ... diagonal zipper located at the back accessing a deep pocket on the bottom, and [the] frame." Memorandum Decision and Order, September 23, 1994 at 2.

As the majority sets forth, trade dress is protected under § 43(a) of the Lanham Act, which provides a private right of action against any party who "in connection with any goods ... or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a). To prevail in a § 43(a) case, a plaintiff must establish (1) that an identifying mark is either (a) inherently distinctive or (b) has acquired distinctiveness through secondary meaning and (2) a likelihood of confusion exists between the similar products sold by plaintiff and defendant. *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992); *Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 582 (2d Cir.1993).

In addition, it is well established that functional packaging and product design are unprotected,[1] and that functionality may be raised as a defense to an action for trade dress infringement. *Paddington*, 996 F.2d at 582. "Functional symbols (those that are essential to a product's use as opposed to

those which merely identify it) are not protected under" the Lanham Act. *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 330 (2d Cir.1983). This defense "was developed to protect advances in functional design from being monopolized. It is designed to encourage competition and the broadest dissemination of useful design features." *Id.* at 331 (footnote omitted).

A functional feature is "one that 'is essential to the use or purpose of the article or [that] affects the cost or quality of the article.'" *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 76 (2d Cir.1985) (quoting *Inwood Lab., Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982)) (alteration in *LeSportsac*). The burden of establishing this affirmative defense rests with the defendant. *LeSportsac*, 754 F.2d at 75–76.

The district court specifically rejected Outbound's argument that any similarity between its child carrier and Tough Traveler's was attributable solely to functionality, noting simply:

In the instant case, it appears to the court that the overall appearance of Tough Traveler's carrier *is* inherently distinctive: despite defendant's claims to the contrary, the *combination* of such arbitrary and fanciful *elements* as a diagonal zipper and two-tone cloth panels of various sizes and shapes—incorporated into a lightweight, narrow and slim design—conveys an inherently distinctive total image and overall appearance.

Memorandum Decision and Order at 5. The court, citing to *LeSportsac*, 754 F.2d 71, also offered the following comments in a footnote:

[A]lthough non-distinctive individual elements might only be functional, "the particular combination and arrangement of [those] design elements ... when viewed in [their] entirety [can be] non-functional." *LeSportsac*, 754 F.2d at 76. Thus the inherent distinctiveness of a trade dress—created by a collection of wholly separate,

1. Under no circumstances do I believe this appeal compels us to decide whether, as urged by appellant, we should adopt the method of analysis recently identified by the Third Circuit in *Duraco Products v. Joy Plastic Enterprises, Ltd.*,

40 F.3d 1431 (3d Cir.1994). *Duraco* classifies "product packaging" as separate from "product configuration" and states that different tests apply to each of the two classes.

but functional parts—is protectable, if that particular amalgamation of disparate parts is not *essential* to the use or purpose of the end product. *See id.*

Memorandum Decision and Order at 5 n. 4 (alterations in Memorandum).

In relying on *LeSportsac,* a case involving similar lines of lightweight luggage, the district court insufficiently appreciated that the defendants had copied arbitrary as well as functional elements of LeSportsac's product. The *LeSportsac* opinion listed a number of arbitrary features of the LeSportsac design that defendants adopted, and explained how defendants could have differentiated their product without diminishing its functionality: "For example, the cotton carpet tape and carrying straps could be placed differently, contrasted in color with the bag or be made thicker or thinner; zipper pulls could be solid or nonrectangular; the repeating elliptical logo could be changed or placed differently." *LeSportsac,* 754 F.2d at 77. In this case the district court failed to identify any specific changes that could be made in Outbound's child carrier that would not affect the functionality of the product. The diagonal zipper creates a wider opening; two-toning is not much of an inspiration; and the lightweight, compact design will be deemed functional by any parent harnessed into this contraption.

The district court's conclusion as to functionality does not consider the guidance furnished by this Court's opinion in *Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971 (2d Cir.1987). The district court had enjoined the defendant from marketing a line of raincoats that bore a strong resemblance to Stormy Clime's "COOL IT" rain jacket. In vacating the injunction, we reviewed the numerous features common to both products: the high-sheen waterproof fabric, the hood, and the cunning vents and folds which "appear[ed] to be dictated by the purpose of providing a low-cost, unencumbering, waterproof jacket for wear while playing golf and other sports." *Id.* at 976. Although the many functional materials, configurations and details resulted in "rainjackets [that] are similar in appearance, their purely ornamental features and labeling differ in almost every respect other than color...." *Id.*

In my view, this case is governed by *Stormy Clime.* Child carriers are as thoroughly functional as clothespins. Once the numerous functional elements of a child carrier are accounted for—the folding frame that forms a stand; the narrow, lightweight back harness; the waist straps; the forward-facing sling seat and headrest of soft fabric; the side flaps to keep out the wind; the utility pocket with a wide zipper opening; and so on—few arbitrary or decorative features can be identified. In affidavits submitted to the district court, defendants point out the functional qualities of nearly every independent component of their product. Joint Appendix ("JA") at 339–47. These functional features dominate the design of the two products.

The one purely arbitrary feature of these products is the label. Both manufacturers have chosen to place their identifying mark squarely in the center of the rear panel. Both labels are large and legible, prominent to people buying the product and noticeable to passersby when the product is in use. As in *Stormy Clime,* the products' "purely ornamental features and labeling differ in almost every respect". And the names of the manufacturers themselves are distinctive and different, except insofar as both names suit the peripatetic use of the product. Furthermore, several aspects of the two products do differ. For example, the metal frame of the Outbound child carrier is black while Tough Traveler's frame is white or unpainted metal. Finally, the record reflects that several other manufacturers make child carriers that employ similar functional features and configurations, and that resemble the Outbound and Tough Traveler models. *See* JA at 164.

Accordingly, I would vacate the preliminary injunction on the ground that district court erred in concluding that Tough Traveler succeeded in demonstrating a likelihood of success on the merits.