MARCY PLAYGROUND, INC.,
et al., Plaintiffs,

v.

CAPITOL RECORDS, INC.,
et al., Defendants.

No. 98 CIV. 2853 LAK.

United States District Court,
S.D. New York.

July 13, 1998.

Peter Herbert, Russell Beck, Epstein, Becker & Green, P.C., New York City, for Plaintiffs.

Christine Lepera, Howard H. Weller, Jeannie Costello, Gold, Farrell & Marks, New York City, for Defendants John Wozniak, Dylan Keefe, Dan Rieser and Chris Blake.

Richard S. Mandel, Jonathan Z. King, Cowan, Liebowitz & Latman, P.C., New York City, for Defendants Capitol Records, Inc. and EMI Records, Inc.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiffs here seek to enjoin the continued distribution of the hit album entitled *Marcy*

*Playground* and the "single" entitled *Sex and Candy* on the theory that these recordings have been released without crediting the plaintiffs for their alleged contributions as producers and therefore violate the Lanham Act and plaintiffs' contractual rights. The Court concludes that plaintiffs have failed to show the necessary threat of immediate and irreparable injury both because they delayed too long in seeking interlocutory relief and because the alleged irreparable injury is speculative. In any case, plaintiffs have not shown a strong likelihood of success on the merits because the facts critical to determination of the action are sharply disputed and have failed to demonstrate that the balance of hardships tips decidedly in their favor. Accordingly, the motion for a preliminary injunction is denied.

## Facts

### Background

Plaintiff Jared Kotler and defendant John Wozniak meet as high school classmates and budding musicians in the mid–1980's. Both aspired to careers in the music business. Their paths diverged, but they resumed contact in or about 1993 or 1994. Although the details of Kotler's right to have done so are hotly disputed, Kotler obtained a "demo" recording which included, perhaps among other things, certain of Wozniak's compositions, and submitted it to EMI–America, then a significant record company. While this did not result in a deal, Don Rubin of EMI expressed interest in considering additional material, although the parties disagree as to whether the additional material in which he was interested consisted only of Wozniak's music or of the joint efforts of Wozniak and Kotler.

In 1995, Wozniak moved to New York. He and Kotler began playing together on an almost daily basis, Wozniak on guitar and Kotler on drums. According to Kotler, they agreed that the pair would perform and record together as a two-member musical group known as "Marcy Playground," that Kotler would be the producer of the project, and that Jeff White, Kotler's cousin and the financier of their efforts, would be the executive producer. Wozniak, on the other hand, contends that he coined and began using the name "Marcy Playground" years before, although he does not directly dispute the other aspects of Kotler's account of this phase of their endeavors.

Whatever the precise arrangements among Kotler, White and Wozniak, the group, assisted by studio musicians, participated in a significant recording session in the spring of 1995 at Sabella Recording Studios in Roslyn, New York. The session was financed by White. The group recorded 13 to 15 compositions by Wozniak, with Wozniak on guitar and Kotler on drums, although the parties are at loggerheads concerning who "produced" the recording.

### The EMI Deal and the Formation of Marcy Playground, Inc.

The product of the Sabella Recording session was another "demo" which was submitted to EMI. This led to a live audition on May 31, 1995 at which EMI executives expressed an intention to sign a record deal with Marcy Playground, which of course then included Kotler as its drummer. Wozniak, to be sure, contends that he was the "key artist" whose presence was the real attraction to EMI.

Although success appears to have been on the horizon, Wozniak contends that it had become increasingly clear to him by mid–1995 that Marcy Playground was being harmed because Kotler's skills as a drummer were not at a professional level. Although it is unclear whether there is a connection with Wozniak's claimed dissatisfaction with Kotler's drumming, he and Kotler recruited Dylan Keefe, a bass guitarist, and Keefe began playing with them over the summer of 1995.

At about this time, White suggested that the group retain a music industry lawyer in connection with the EMI recording deal, and the trio—White, Kotler and Wozniak—retained Fred Davis for that purpose. Marcy Playground, Inc. ("MPI"), the corporate plaintiff was formed, with Kotler and Wozniak each allegedly owning 45 percent of the shares and White the balance, to exploit the products of the group—although Wozniak claims that he was neither consulted nor advised concerning the implications of this step and asserts that Davis had a conflict of

interest in representing all three in this connection.

On October 27, 1995, MPI entered into a recording contract, signed on its behalf by Wozniak, with EMI pursuant to which it granted EMI the exclusive recording artist services of Wozniak and Kotler performing as Marcy Playground. The contract was accompanied by a so-called Inducement Letter in which MPI represented and agreed that it possessed the exclusive right to the services of Wozniak and Kotler as recording artists and that it was the sole owner of their product to date including what the parties have referred to as the Original Marcy Playground Recordings. The Original Marcy Playground Recordings were intended as the source of the first two albums of the three album EMI deal.

### The Emergence of the Dispute

On the heels of the signing of the EMI deal, Wozniak and Kotler fell out. Keefe began to accompany the group's live performances, allegedly over Kotler's objection. According to Wozniak, EMI executives and other music industry professionals expressed concern that Kotler's allegedly poor drum performances were hurting the group. Wozniak and Keefe persuaded Kotler to play second guitar behind Wozniak and to permit Wozniak's friend, Dan Rieser, to play the drums. Tension was in the air.

By the spring of 1996, EMI had not released the first album contemplated by the recording agreement, which came to be known as *Marcy Playground*. It was at about this point, Kotler claims, that a senior EMI executive threatened to withhold release of the album unless Kotler agreed to stop performing as a member of Marcy Playground. In any case, it is undisputed that Kotler stopped performing with Marcy Playground at about this point.

Wozniak contends that the absence of any final agreement among himself, Kotler and White at the time of Kotler's departure from the group threatened to delay or prevent release of the first album and that EMI executives assisted in settlement discussions among the combatants. Kotler requested, among other things, that he be credited on the album as co-producer and that a Kotler/White production company logo be included on the outer packaging, both to further their alleged ambitions as record producers. Wozniak, allegedly "[i]n an effort to defuse a volatile, painful situation and because [he] believed a settlement was close," agreed. The album was released in February 1997 with the credits Kotler had requested. The anticipated settlement among White, Kotler and Wozniak thereupon failed to materialize.

*Marcy Playground* was not an immediate success, achieving only insignificant sales in the first weeks following its release. In the meantime, EMI ceased record operations in April–May 1997. Some time later, its affiliate, defendant Capitol Records, Inc. ("Capitol") assumed the MPI recording agreement and decided to reissue *Marcy Playground*. According to Kotler, Wozniak, his agent and Capitol insisted that he and White agree to the previously rejected settlement proposal as a condition for giving Kotler and the Kotler/White entity (Mighty Slim Productions) the same credit on the reissued album as on the original. Wozniak and his agent rejoin that they decided to eliminate the producer credits previously given to Kotler, White and their company because those credits never reflected the reality of what had occurred and were given only as a gratuitous gesture in anticipation of a settlement that never was consummated. Capitol, for its part, says that it was aware of conflicting claims as to who had produced what, that it had no way to determine the truth, and that it therefore acted in conformity to the alleged custom of the industry by accepting the information provided by the band's manager, who at that point of course was Wozniak's creature.

*Marcy Playground* was reissued on September 25, 1997 and has become a substantial success. Approximately 1.5 million copies have been sold, and the album remains number 54 on the relevant *Billboard* magazine chart. An undetermined number remains in Capitol's inventory.

It should be noted also that Capitol on March 12, 1998 released the first "single" from *Marcy Playground*, which is entitled *Sex and Candy* and actually includes three

songs only one of which is ·also on *Marcy Playground.* *Sex and Candy,* however, was deleted from Capitol's catalog on April 4, 1998, and there are no plans for any additional printings.

### Post–Reissue Settlement Discussions and this Litigation

There were sporadic efforts to resolve the dispute between Wozniak and Kotler from the time of *Marcy Playground'*s initial release in March 1997 through its reissuance in late September 1997 punctuated by the expected exchange of "pleasantries" when Kotler learned that the credits would be revised for the reissued album. By the time of the reissuance, the parties had set forth their positions and retreated in silence to their respective corners. As indicated above, however, the reissued album rapidly achieved great success. On November 20, 1997, plaintiff's counsel contacted Capitol and raised the issue of settlement once again.[1] This appears to have resulted in a reopening of talks on December 1, 1997.[2]

The parties understandably have lavished a great deal of attention on their respective accounts of the discussions that ensued in the December 1997 to March 1998 period. Both are mindful of the adverse impact of unexplained or unjustified delay on a movant's prospects for preliminary injunctive relief. The defendants seek to portray the communications between the parties during this period as only remotely connected to settlement and, in any case, characterized by long and unexplained delays on the plaintiffs' part so as to charge plaintiffs with undue delay in making this motion. The plaintiffs, on the other hand, claim that negotiations "were continuous, bilateral, progressive and fruitful"[3] and seek to tax the defendants with responsibility for any delays that did occur.

Resolution of this dispute appears quite likely impossible absent a substantial evidentiary hearing. Even on plaintiffs' version, however, "the parties' settlement negotia-

tions ... came to abrupt, unexpected and rather shocking closure in mid-March ..."[4] Hence, plaintiffs waited approximately five weeks before filing this action on April 22, 1998 and almost three months after the cessation of talks before seeking a preliminary injunction.

### Discussion

The Court is met at the outset with a dispute as to the applicable standard for issuance of a preliminary injunction in this case. Defendants argue that the injunction plaintiffs seek—which would restrain *inter alia* any further distribution or sale of *Marcy Playground* or *Sex and Candy*—effectively would force a product recall and alter that *status quo* and therefore must be considered against the standard applicable to mandatory preliminary injunctions. In their reply papers, plaintiffs disavow any request for a product recall, indicating that they would be quite content with a restraint on any *further* sale or distribution at Capitol's level. Plaintiffs' concession thus eliminates one of the props supporting defendants' argument that the injunction sought is mandatory in character, but ignores the fact that they seek to alter the *status quo.*

An injunction that is prohibitory to one person often will seem mandatory to another, and the distinction does not necessarily determine which standard applies to the application.[5] As the plaintiffs are not entitled to relief even under the most relaxed standard, however, there is no need to explore this interesting issue.

Under the usual standard, the movant, in order to obtain a preliminary injunction, must demonstrate "(a) irreparable harm and (b) either the likelihood of success on the merits or (c) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly toward the party requesting preliminary relief."[6] A clear show-

1. McMullan Decl. ¶ 13.

2. Herbert Decl. ¶ 6.

3. *Id.* ¶ 13.

4. *Id.*

5. ·*See, e.g., Jolly v. Coughlin,* 76 F.3d 468, 474 (2d Cir.1996).

6. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

ing of threatened irreparable harm, as the foregoing suggests, is indispensable.[7] Accordingly, examination of plaintiffs' claim of irreparable injury is the proper starting point for analysis.

*Irreparable Injury*

Insofar as is relevant to the present motion, the complaint in this case alleges that the defendants' distribution of *Marcy Playground* and *Sex and Candy* without the proper credits to Kotler, White and their production entity violates Section 43(a) of the Lanham Act [8] because it falsely suggests that Wozniak was the sole producer and that the plaintiffs were not involved in the production.[9] The claim is one of reverse palming off—essentially, the removal of the name or mark of the source of the product and its sale under the wrongdoer's name or mark.[10] Plaintiffs claim that they are threatened with irreparable injury because they are being deprived of credit for their role in bringing these recordings into existence, a deprivation that allegedly is particularly harmful because Kotler and White are seeking to establish themselves in the music industry.[11]

Irreparable injury ordinarily is presumed in copyright, trademark and trade dress infringement cases.[12] As the theory underlying the presumption rests on the difficulty of remedying confusion in the market place by an award of damages,[13] the Court assumes that the presumption applies in a case like this one. But it is equally well established that "any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." [14]

In this' case, *Marcy Playground* was re-released, without giving the credits that plaintiffs regard as their due, on September 25, 1997. Plaintiffs brought this action on or about April 22, 1998, more than six months later. They did not seek a preliminary injunction until mid-June 1998, almost nine months later. Even if the Court were to accept plaintiffs' account of the discussions between the parties in the period September 1997 through March 1998 and to assume (as seems likely) that the diligent pursuit of settlement negotiations is a legally sufficient excuse for delay, it would remain undisputed that the discussion broke down entirely in mid-March. Thus, on the view of the evidence most favorable to plaintiffs, there was an unexplained delay of about five weeks in bringing suit and of three months in seeking a preliminary injunction.[15]

Not every delay in seeking interlocutory relief defeats the presumption of irreparable injury in cases such as this. The cases reflect that "delay attributable to good faith investigation or a failure to realize the severity of the infringement does not." [16] But here there is no excuse whatever for the delay from mid-March until mid-June. This delay is more than sufficient basis for concluding that any presumption of irreparable injury

---

7. *E.g., Triebwasser v. Am. Tel. & Tel. Co.*, 535 F.2d 1356, 1359 (2d Cir.1976).

8. 15 U.S.C. § 1125(a).

9. Plaintiffs claim also that the defendants' actions violate their contractual rights.

10. Pl. Mem. 10–11. *See, e.g., Rosenfeld v. W.B. Saunders*, 728 F.Supp. 236, 241 (S.D.N.Y.), *aff'd*, 923 F.2d 845 (2d Cir.1990) (table).

11. White Decl. ¶ 12; Pl. Mem. 14–15; *see* Kotler Decl. ¶ 54.

12. *E.g., Richard Feiner and Co. v. Turner Ent. Co.*, *MGM/UA*, 98 F.3d 33, 34 (2d Cir.1996) (copyright); *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 967–68 (2d Cir.1995) (trademark/trade dress).

13. *E.g., Tough Traveler, Ltd.*, 60 F.3d at 967–68.

14. *Id.* at 968.

15. After the Court announced its decision in open court, plaintiffs' counsel contended that the release of *Sex and Candy* after the breakdown of settlement talks was an important event in precipitating this motion. The assertion is not persuasive. *Sex and Candy* was removed from Capitol's catalog in early April, well over two full months before this motion was brought.

16. *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp. 896, 909–10 (S.D.N.Y.1995) (collecting cases).

has been vitiated.[17] Moreover, while the Court need not rely on the interval from September through March, the fact that plaintiffs did not seek relief during that period despite the alleged pendency of settlement discussions further undercuts their claim of irreparable injury.

The conclusion that the presumption has fallen away is not necessarily dispositive, as the Court of Appeals has not yet held that unexcused delay alone necessarily defeats a preliminary injunction motion, particularly in the face of District Court findings of irreparable injury based upon evidence before it.[18] But the Court need not determine this unresolved question, as the evidence before it would not support a finding of irreparable injury in the absence of the presumption. Indeed, it would sap the lifeunder from the presumption even if breath remained in it.

To begin with, there is precious little basis for supposing that there is any real confusion in the market place. We are dealing, after all, with production credits on printed materials accompanying recorded popular music. There is no reason to suppose that a single recording has been sold or not sold, or that a single consumer cares, whether Kotler is listed as co-producer or White as executive producer. The music is sold for other reasons entirely.

Second, there is no convincing basis for concluding that the careers of Kotler and/or White will be affected in any material way by whether they are credited on these materials. While the Court assumes that those in the music business who might consider dealing with Kotler or White as record producers would consider their prior production experience as relevant, the question whether their names are listed on the reissued recordings as the result of an interlocutory court order pending the resolution of a dispute as to

whether they in fact performed those functions seems of little consequence. The important facts are that Kotler and White claim to have performed those functions, Wozniak denies it, and the matter is in litigation. Those facts would not be altered by a preliminary injunction. The only evidence to the contrary are the conclusory and unsubstantiated assertions of irreparable injury by Kotler and White, the persuasiveness of which is significantly undercut by their relative inexperience in the music business and their manifest self interest. Indeed, if the liner credits were as important as they now claim, they would have sought a preliminary injunction months ago.

Third, the movant for a preliminary injunction must show not only that irreparable injury is possible, but that it is likely.[19] Plaintiffs' showing certainly does not rise to that level. The most that can be said is that they have advanced a speculative theory.

Finally, it is evident that any injury the sale of the reissued album might cause already has occurred in virtually all material respects. While the parties have been somewhat imprecise as to the exact numbers of copies in distribution, at least one million copies actually have been sold and somewhere between 300,000 and 500,000 appear to be in the hands of retailers and, by virtue of plaintiffs' concession, would be unaffected by any preliminary injunction. Thus, the allegedly incorrect album liner has been distributed very extensively whereas the parties agree that any injunction would affect only a comparatively small number of albums remaining in Capitol's inventory. Hence, a preliminary injunction here would be very much like locking the barn door after the horse is gone.[20]

For all these reasons, the Court finds that plaintiffs have failed to demonstrate any ma-

**17.** See id. at 910 (three month delay unreasonable); Comic Strip, Inc. v. Fox Television Stations, Inc., 710 F.Supp. 976, 981 (S.D.N.Y.1989) (same).

**18.** See Tough Traveler, Ltd., 60 F.3d at 969 (Jacobs, J., concurring); Markowitz Jewelry Co. v. Chapal/Zenray, Inc., 988 F.Supp. 404, 407 n. 16 (S.D.N.Y.1997); Bear U.S.A., Inc., 909 F.Supp. at 910.

**19.** Jackson Dairy, Inc., 596 F.2d at 72; Spira v. Nick, 876 F.Supp. 553, 562 (S.D.N.Y.1995).

**20.** Plaintiffs suggested also that the injunction would be necessary with respect to any new printing of the album. There is no evidence, however, that any such new printing is likely.

terial threat of irreparable injury. Indeed, the circumstances suggest something else entirely—that plaintiffs are seeking to use the threat of disruption of marketing of a highly successful recording as leverage in seeking an advantageous settlement.

*Balance of Hardships*

Even if plaintiffs had demonstrated a threat of irreparable injury, they would not be entitled to a preliminary injunction absent proof that the balance of hardships tips decidedly in their favor, as the Court is not prepared to say on this record that they have established a likelihood of success.[21] Plaintiffs have not produced such evidence.

In the event that a preliminary injunction were wrongly denied, the injury to plaintiffs is the risk that their nascent reputations as record producers might be injured by the lack of credits on the album liners. On the other hand, the erroneous issuance of a preliminary injunction would interrupt the marketing of a hit recording that is generating very substantial revenues, revenues in which the plaintiffs are likely to share in the event they prevail in this case. While it is relatively certain that such an interruption would have a significant and negative impact on the revenue stream, there would be no reliable means of estimating that effect. In consequence, the balance here is straightforward. On the one hand, an erroneous denial of an injunction risks a speculative adverse impact on the plaintiff. An erroneous grant, on the other hand, seems quite likely to result in significant but unmeasurable economic injury to the defendants and, in all likelihood, to the plaintiffs as well. In these circumstances, plaintiffs have not carried their burden.

*Conclusion*

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is denied. The foregoing constitute the Court's findings of fact and conclusions of law, supplementing those contained in its oral opinion in open court.

SO ORDERED.

---

**21.** Virtually all of the pivotal facts are sharply contested, and the outcome is likely to turn on the trier's assessment of the credibility of a number of witnesses. While the existence of factual disputes does not require the conclusion that a movant lacks a strong likelihood of success on the merits, it certainly is relevant. *See, e.g., Desknet Systems, Inc. v. Desknet, Inc.*, No. 96 Civ. 9548(JSM), 1997 WL 253246, at *3 (S.D.N.Y. 1997); *Railroad P.B.A. of New York v. Metro–North Commuter R.R.*, 699 F.Supp. 40, 43 (S.D.N.Y.1988). An evidentiary hearing, which neither side has sought, would give a somewhat firmer basis for forming a conclusion. Nevertheless, unless the evidentiary hearing were to be as extensive as the plenary trial, the Court would be compelled to bear in mind that its findings at the motion stage would be provisional in nature.