**CIRCLE LINE SIGHTSEEING YACHTS, INC., and New York Cruise Lines, Inc., Plaintiffs,**

v.

**CIRCLE LINE—STATUE OF LIBERTY FERRY, INC., Defendant.**

**No. 01 Civ. 9788(NRB).**

United States District Court, S.D. New York.

April 15, 2002.

Joseph Diamante, Pennie & Edmonds LLP, New York, New York, for Plaintiffs.

David R. Francescani, Maryann V. Hayes, Fish & Richardson P.C., New York, New York, for Defendant.

### MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiffs Circle Line Sightseeing Yachts, Inc. ("Yachts") and New York

Cruise Lines, Inc. ("Cruise Lines") bring this suit for service mark infringement and related claims against defendant Circle Line—Statue of Liberty Ferry ("Ferry"). Presently before the Court is Yachts's motion for a preliminary injunction. For the reasons that follow, the motion is denied.

## BACKGROUND

Since 1945, visitors and New Yorkers alike have boarded vessels adorned with the name "Circle Line" from Pier 83 at West 42nd Street in midtown Manhattan for a sightseeing cruise in the waterways surrounding Manhattan Island. Since the early 1950s, people have taken boat trips from Battery Park, at the Southern tip of Manhattan, and traveled to the Statue of Liberty, also aboard the "Circle Line." Unbeknownst to many, if not most or all, of these customers, the "Circle Line" that circumnavigates Manhattan is, was, and always has been operated by a different corporation than the "Circle Line" that ferries customers to the Statue of Liberty. The former "Circle Line" is plaintiff Yachts, and the latter "Circle Line" is defendant Ferry.

Yachts, a closely held corporation, has conducted sightseeing cruises in the Hudson, East, and Harlem Rivers for nearly sixty years, including its "classic three-hour Full Island Cruise, the famous sightseeing cruise that circumnavigates Manhattan Island," from which the name "Circle Line" originates. Compl. ¶¶ 8–9. In 1953, the owners of Yachts decided to expand the business to offer a ferry service from Battery Park to Liberty Island, the home of the Statue of Liberty.[1] Apparently for ordinary business reasons,[2] a new corporation, Ferry, was created to run this ferry service. Although distinct corporate entities, both Yachts and Ferry chose to use virtually identical logos incorporating a stylized "Circle Line" logo in their advertisements and on their company letterhead. *See Id.* Exs. E (Yachts's letterhead), D (Ferry's letterhead).

The inevitable confusion among consumers who mistakenly believed that Yachts and Ferry were the same corporation was of no consequence, however, because both were closely-held corporations owned by the same few shareholders.[3] On July 6, 1981, however, these owners sold their shares in Yachts, but not in Ferry, to Cruise Lines[4] via an "Acquisition Agreement." *See* J. Moran Decl. Ex. A (Acquisition Agreement); Andren Decl. ¶ 4.

By all accounts, for twenty years, Yachts and Ferry coexisted peacefully, the former providing "sightseeing cruises" around Manhattan, and the latter providing "ferry" service to the Statue of Liberty and Ellis Island. Following the terrorist attacks on the World Trade Center on September 11, 2001, however, the National Parks Service closed Liberty and Ellis Islands to visitors indefinitely, thereby effectively putting Ferry out of business (at least temporarily).[5] In response, on October 24, 2001, Ferry began offering "harbor

---

1. Ferry's services were expanded in the 1990s to include trips to nearby Ellis Island, as well as departures from Liberty State Park in Jersey City, New Jersey, across the Hudson from Battery Park.

2. Such as tax, liability, or insurance considerations.

3. It appears that, as of July 6, 1981, the same seven shareholders held all outstanding shares in both Yachts and Ferry. Declaration of Joseph Moran ("J. Moran Decl."), Ex. A, at 35–36.

4. According to its Chairman and CEO Karl Andren, Cruise Lines is nothing more than the holding company of Yachts. Declaration of Karl Andren ("Andren Decl.") ¶ 1.

5. Yachts was also prevented from offering sightseeing tours in the waterways surrounding Manhattan for about eight days following the terrorist attacks. Andren Decl. ¶ 11.

tours" that would take passengers *near* Liberty and Ellis Islands, but would not permit them to disembark at the Islands.[6] K. Moran Decl. ¶ 10. Shortly thereafter, on November 6, Yachts filed the instant Complaint, and on November 13, Yachts served Ferry with notice of the present motion for a preliminary injunction that would prevent Ferry from using CIRCLE LINE in connection with these harbor tours. After staying this motion while the parties attempted to reach a settlement,[7] we held an oral argument on April 2, 2002, and now reach the merits of Yachts's motion.

## DISCUSSION

### I.  Preliminary Injunction Standard

■ "In order to obtain a preliminary injunction, the moving party must show (1) the likelihood of irreparable injury, and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hard-

ships tipping decidedly in the movant's favor." *Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 967 (2d Cir.1995).[8] As the following discussion makes clear, Yachts has not made a sufficiently persuasive showing on the merits to warrant the relief sought. Accordingly, we deny the motion on that ground, and do not reach the issue of irreparable harm.

### II.  Improbability of Success on the Merits

Before 1981, there was no need for Yachts and Ferry to define the rights each held in the mark CIRCLE LINE with specificity because there was a complete overlap of ownership between the two corporations. The sale of the shares in Yachts, but not in Ferry, to Cruise Lines created an obvious need to define the rights in the mark. Thus, § 1.12 of the Acquisition Agreement states:

> Except as set forth in Schedule G[9] heretofore delivered by the Stockholders to

6. Since December 20, 2001, the National Parks Service has again permitted Ferry to land passengers at Liberty and Ellis Island, so long as those passengers underwent a security screening. As practiced, this security screening led to considerably longer lines than had existed without them. "In order to alleviate those long lines, [Ferry continued to] offer[ ] its customers the opportunity to take the Circle Line non-stop harbor tour which did not involve proceeding through the National Park Service's security checkpoints." Declaration of Kevin Moran ("K. Moran Decl.") ¶ 12.

7. We held a conference with the parties to discuss Yachts's motion on November 16, 2001, at which time counsel indicated that a settlement was both desirable and likely. Accordingly, the instant motion was stayed to give the parties an opportunity to conduct settlement negotiations, and a conference was scheduled for November 30 for the purpose of setting a briefing schedule in the event that *the matter did not settle.* In a letter from Yachts dated November 30, however, the parties jointly requested an adjournment of the scheduling conference until December 14. This request was granted, but the scheduling

conference was eventually cancelled in favor of a settlement conference to be held on December 20. At this conference, the parties again asked for more time to attempt to reach a settlement, which request was granted. During a January 14, 2002, conference the parties represented that settlement was unlikely, and, therefore, a briefing schedule was finally established.

8. In considering whether Yachts has sustained this burden, we are mindful of the Second Circuit's caution that a preliminary injunction is an "extraordinary and drastic remedy which should not be routinely granted." *Medical Soc'y of N.Y. v. Toia,* 560 F.2d 535, 538 (2d Cir.1977); *see also Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (noting that a preliminary injunction is an "extraordinary and drastic remedy," and should not be granted unless the movant carries its burden "by a clear showing") (internal quotation marks, citation, and emphasis omitted).

9. Schedule G reads, in pertinent part, "NONE."

Purchaser, no Company[10] owns, has, or requires in connection with the conduct of its business any rights to the use of any patents, trademarks, service marks, trade names, copyrights or applications for any of the foregoing.

Clearly, based on this provision, no rights in CIRCLE LINE were transferred to Yachts. Rather, as the result of arm's length negotiation between the owners of Ferry and the new owner of Yachts, both corporations decided to continue to use the CIRCLE LINE mark, with neither having superior rights to the other. Thus, the parties to this suit apparently settled the issues we now confront in a bargained-for agreement over twenty years ago. The fact that neither had challenged the other's use of CIRCLE LINE in the interim supports this reading.

The clear intent not to have conveyed exclusive rights to use to CIRCLE LINE mark is further supported by a proposed "Trademark Agreement" sent by Yachts to Ferry on June 18, 2001, months before Ferry expanded its operations to the alleged detriment of Yachts. J. Moran Decl. Ex. B (Trademark Agreement); *see id.* ¶ 14. As proposed, the Trademark Agreement would have "supercede[d] all prior written or oral agreements between" Yachts and Ferry with respect to CIRCLE LINE. J. Moran Decl. Ex. B ¶ 5. Under the proposed Trademark Agreement, Ferry would have "acknowledge[d] and agree[d] that in the [Acquisition Agreement], Yachts acquired sole and exclusive ownership of all right, title and interest in and to [CIRCLE LINE], and all of the goodwill associated therewith." *Id.* Ex. B ¶ 4. Ferry, however, did not agree to these terms and never signed the

Trademark Agreement. *Id.* ¶ 14. Ferry's proffer of this Agreement and Ferry's refusal to agree, is evidence of the pre-litigation views of the parties, which are consistent with our determination herein.

Despite these documents, Yachts claims that the parties also entered into an oral "consent agreement" whereby Yachts "consented" to Ferry's limited use of CIRCLE LINE for ferry services. Pl.'s Mem. at 11–12. In Yachts's view, by expanding the service it offered to include harbor tours, Ferry violated this consent agreement and infringed on its rights to CIRCLE LINE. *Id.* Yachts points to Ferry's forty eight year practice of only operating a ferry service from "point A to point B" in support of its consent agreement theory. *Id.* at 11.

Even without reliance on the documentary evidence, however, this argument fails to carry the day for Yachts. Despite the fact that Ferry's ferry service does indeed carry passengers from one place to another, the record supports the conclusion that these passengers were tourists and other sightseers wishing to see two of New York's most important landmarks, not daily commuters simply seeking the fastest route from "point A to point B." *See* Declaration of Marc Mancini, Ph.D. ¶ 5 (defining a "ferry" as a vessel "used for conveying passengers and goods on a *regular* and relatively short journey") (emphasis supplied) (internal quotation marks omitted). The primary intent of Ferry's passengers is identical to that of Yacht's passengers: sightseeing. Hence, the line Yachts seeks to draw between Ferry's ferry service on the one hand, and its own sightseeing tour on the other, *see id.,* is at least blurry, and possibly illusionary.[11]

---

**10.** Yachts is defined in the Acquisition Agreement as a "Company."

**11.** Indeed, Yachts admits that it offered a ferry service from Pier 83 to Battery Park, and on to South Street Seaport, under the name "Circle Line's Statue/Times Square Express." Letter from Joseph Diamante dated April 4, 2002. This admission seriously undermine its "separate spheres" consent agreement theory.

In sum, Yachts has not met its burden of establishing that it holds exclusive rights [12] in CIRCLE LINE that have been infringed by Ferry and, therefore, has failed to show a likelihood of success on the merits of its infringement and related claims.[13]

## CONCLUSION

For the reasons stated above, Yachts's motion for a preliminary injunction is denied. The parties are to appear for a conference before the Court on April 25, 2002, at 3:00 p.m.

**IT IS SO ORDERED.**

---

12. We acknowledge that Yachts has held service marks for CIRCLE LINE and CIRCLE LINE stylized, both for "conducting sightseeing cruise services by yacht or boat" since November 27, 1984. Compl. Ex. A. There is a significant question, however, as to the validity of these service marks, as a service mark application requires a verified statement that, *inter alia*, "to the best of the declarant's knowledge and belief, no other person has the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when applied to the goods or services of the other person, to cause confusion or mistake." 37 C.F.R. § 2.33(b)(1). Yachts has admitted, however, the obvious fact that customers were confused as to the source or affiliation between Ferry and itself. Declaration of Peter Cavrell ¶ 20. We have every reason to believe that this confusion predated Yachts's service mark applications. Accordingly, Yachts has not per-

suaded the Court that the service marks held by Yachts actually grant it the "exclusive rights" it claims. Compl. ¶ 15. Moreover, even if these service marks do grant exclusive rights, Yachts may have a laches problem, as it had not protested Ferry's use of nearly identical marks for seventeen years.

13. Finally, even assuming, *arguendo*, that there are "sufficiently serious questions going to the merits," Yachts has not shown that the "balance of hardships tip[s] decidedly in [its] favor." *Tough Traveler,* 60 F.3d at 967. While it is undisputed that Yachts's business is worse this year than in the past, it has not demonstrated that this is due to new competition from Ferry, rather than the overall drop in tourism in New York City since the terrorist attacks on the World Trade Center. *See, e.g.,* Declaration of David R. Francescani Exs. E–N.